**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| THE TRIPLE-I CORPORATION | ) | |
| | ) | |
| Plaintiff | ) | CONSOLIDATED CASES |
| | ) | |
| vs. | ) | Case No. 2:06-CV-02195-EFM-KMH |
| | ) | |
| HUDSON ASSOCIATES CONSULTING, INC., ET AL., | ) ) | Case No. 2:06-CV-02381-EFM-KMH |
| | ) | Case No. 2:06-CV-02461-EFM-KMH |
| Defendants. | ) | |
| | ) | |

**MOTION TO STRIKE AFFIDAVIT OF ROBERT SPACHMAN AND**

**MEMORANDUM IN SUPPORT**

The KMPro Parties respectfully move the court to strike the affidavit submitted by Robert Spachman in opposition to their Motion For Partial Summary Judgment With Respect To Count III of Triple-I's First Amended Complaint for the reason that it is (1) not based upon personal knowledge and (2) contains speculation and conclusions rather than admissible facts. Triple-I's opposition to the motion for partial summary judgment is almost exclusively based upon the Spachman affidavit. When it is stricken, there is no basis for Triple-I's opposition.

Morris documents.

In paragraphs 2 through 7, Mr. Spachman argues that certain documents subpoenaed from Dr. Rodler Morris will bear on Triple-I's claim of tortious interference and its claim for damages from tortious interference. Mr. Spachman refers to the separate paragraphs of the subpoena but he does not state that he is personally aware of any documents that would actually fall within the categories described, and if so, what those documents are likely to show. He also fails to describe how those documents would bear on any of the issues raised in this motion for

partial summary judgment. Mr. Spachman does not state that he has personal knowledge of any documents sought from Dr. Morris. Mr. Spachman does not state that he has tried to obtain these documents from any other source. Mr. Spachman does not acknowledge that Dr. Morris states he does not have control of these documents but that they are within the control of Dr. Morris' employer, Computer Sciences Corporation ("CSC"), and that Mr. Spachman has failed to seek those documents from the employer.

In paragraphs 8 through 14, Mr. Spachman argues that Triple-I needs certain documents he claims have not been produced by the KMPro Parties. Mr. Spachman does not state that he has personal knowledge that the documents exist. Mr. Spachman does not state how the particular documents, if they exist, would assist in proving any element of Triple-I's Count III for tortious interference. He cannot do so because he lacks personal knowledge.

In paragraph 15, Mr. Spachman argues that Triple-I was forced to cease using IKMI to provide training to Triple-I personnel at Fort Leavenworth due to some conduct by the KMPro Parties. This statement has no bearing on the claim asserted in Count III of the First Amended Complaint because there is no allegation that IKMI training had to cease in that count. Further, the vague allegation of "numerous improper contacts" is not a fact but is a conclusion and is not admissible evidence. Finally, the evidence shows only that Triple-I was asked to remove the training from Fort Leavenworth.

In paragraph 17, Mr. Spachman argues that there was a contractual obligation by Triple-I to provide certain services. The contract to which Mr. Spachman refers is not attached to his affidavit and his interpretation of what a contract provides in the absence of the contract being admitted into evidence is not admissible proof of what the contract requires.

In paragraph 18, Mr. Spachman claims that the 2003 subcontract between Cubic and Triple-I that is the subject of the allegations in Count III did not refer to the Battle Command Knowledge System ("BCKS").  This is inconsistent with Mr. Spachman's claim in paragraph 49 that Triple-I authored the knowledge management sections of the Cubic/Triple-I Joint Task Order Proposal Plan made to the Army regarding the BCKS, and was the entity that supplied the bulk of the knowledge management services to the Army for the BCKS project.  Triple-I has only produced one contractual document in this litigation.  If there is another contract, they have not provided it.

In paragraph 20, Mr. Spachman claims that Triple-I and Cubic were working effectively on the BCKS and other projects.  This is a conclusion, not admissible evidence.  In any case, it does not support the claim that the relationship was ever disrupted.

In paragraph 21, Mr. Spachman states that the statement of facts by the KMPro Parties fails to show that the business relationship between Triple-I and Cubic would not continue into the future as it had for years.  The problem with this statement is that the Cubic and Triple-I relationship did continue into the future, and there is no proof in the record that there was any interruption of the relationship between Triple-I and Cubic.  The attached pages of the Triple-I website show the contractual relationships between Triple-I and Cubic have continued.  Exhibit 1.  We already have a finding by this court that there is no evidence of any damages to Triple-I from the registration of the CKM trademark in Kansas.  There is also no other evidence of damage to Triple-I from any conduct by any of the KMPro Parties.  Mr. Spachman makes no statement that Triple-I failed to receive any income as a result of any conduct by the KMPro Parties.

In paragraph 22, Mr. Spachman alleges that the KMPro Parties began to undermine the relationship between Triple-I and Cubic as early as 2006. He provides no proof of that statement. It is a vague conclusion without supportive facts and he does not have personal knowledge to support it.

In paragraph 23, Mr. Spachman makes the equally unfounded claim that some conduct of unknown character caused the U. S. Army to modify its bid process so that Cubic was not able to bid on the BCKS "rebid". This is obviously unsupported speculation not based on personal knowledge. He does not present any facts from which the Court could reach any conclusion.

In paragraph 24, Mr. Spachman makes the statement that the personal relationship between Ron Dysvick and General Schmader deteriorated after KMPro posted on its website the "blistering indictment" of Weidner. Obviously, "blistering indictment" is a conclusion, not a fact. The personal relationship between Dysvick and Schmader has unequivocally been shown in the moving papers not to be a desirable relationship in the first place. Mr. Spachman does not describe any deterioration or facts that would support a conclusion of any material deterioration.

In paragraph 25, Mr. Spachman claims that Triple-I was prevented from participating in the bidding process with Cubic, but only because Cubic was no longer qualified to bid as a prime contractor. This supports the KMPro Parties' position that the relationship between Triple-I and Cubic was not harmed in any way by conduct from the KMPro Parties. "The only thing that prevented Triple-I from participating with Cubic on the rebid contract was the Army's decision, as a result of the poisoning of the Army's view of and relationship with Triple-I, to dramatically change the parameters of the rebid process, altering which entities could participate in that process, and thereby excluding Cubic as a prime contractor."

In paragraph 27 Mr. Spachman offers his opinion that none of the incidents between Mr. Dysvick and Mr. Schmader impaired the relationship between Triple-I and Cubic. This is not an admissible statement. Elsewhere Mr. Spachman claims not to have witnessed any of those incidents. He was not on staff with Cubic. He does not claim to have actual knowledge of Cubic's thinking.

In paragraph 28 Mr. Spachman concludes that Mr. Schmader's use of vulgar language does not indicate the relationship between Cubic and Triple-I had been impaired. Mr. Spachman does not claim to have any personal knowledge of any vulgar language used by Mr. Schmader with Dysvick.

In paragraph 30, Mr. Spachman's attribution of a "no effect" observation of Mr. Schmader's threat does not negate the belief held by Mr. Hiemstra.

In paragraph 31 Mr. Spachman seeks to attribute a different meaning to a statement but he does not deny the statement was made.

In paragraph 32 Mr. Spachman states a claim about what Cubic wanted without providing any factual basis for his conclusion.

In paragraph 33 Mr. Spachman admits that Triple-I was the subject of an unsolicited offer of purchase by Cubic, and that Mr. Ballentine offered Mr. Dysvick a position as the head of a Cubic division at the time Mr. Dysvick was employed by Triple-I. Mr. Spachman then concludes that the two companies, Cubic and Triple-I, were working well together.

In paragraph 36 Mr. Spachman claims that there is no evidence that Triple-I aspired to become the foremost knowledge management organization in the world, even though Mr. Dysvick claims and Mr. Spachman admits that Mr. Dysvick and Triple-I wrote the proposal in which that claim was made.

In paragraph 37 Mr. Spachman makes a claim without personal knowledge of when the recompete process began and he does nothing to negate the strategic discussion time period of October and November of 2005.

In paragraph 39 Mr. Spachman states that Mr. Schmader never signed any of the contracts. Apparently this is designed to negate the fact that Mr. Schmader claimed to Mr. Dysvick that Dysvick's contract was void because Schmader didn't sign it. It does not rebut this fact at all.

In paragraphs 41 and 42 Mr. Spachman puts a gloss on the offer to purchase Triple-I made by Cubic and suggests the offer was something desired by Triple-I. That is inconsistent with the fact that the offer was rejected.

In paragraph 43 Mr. Spachman makes claims about where Dr. Morris was working in 2003 and knowledge Dr. Morris had about Mr. Dysvick and General Stanley Cherrie. Mr. Spachman provides no enlightenment as to how he claims to have come to this knowledge. It is not admissible evidence.

In paragraphs 44 and 45 Mr. Spachman makes claims about Dr. Morris. Mr. Spachman was not present for any communications with Dr. Morris and Mr. Dysvick and does not so claim. He has no basis for the statement that Dr. Morris resigned after having been severely criticized. Mr. Spachman also seeks by this statement to infer that Morris was terminated, which is demonstrably false. In any case, Mr. Spachman has no ability to contradict Dr. Morris' statement of his reason for quitting.

In paragraph 46 Mr. Spachman speaks of qualifications held by Triple-I necessary to meet its contractual requirements to the satisfaction of both Cubic and the Army, including knowledge management qualifications. He does not state what those qualifications were and he

does not provide any basis for understanding whether the requirements for the Army and Cubic were satisfied. This is a conclusion not a fact.

In paragraph 47 Mr. Spachman makes the statement that Cubic was entirely dependent on Triple-I to perform Cubic's services to the Army. He does not identify what those services were or what Triple-I performed. He has not provided a contract that had any knowledge management obligations by Cubic to the Army or similarly by Triple-I to Cubic. This is a conclusion not a fact.

In paragraph 48 Mr. Spachman offers his opinion that Cubic had virtually no expertise in the field of knowledge management. He does not provide any basis for him having this knowledge. He does not provide a source for that and it is fair to say that Cubic would disagree.

In paragraph 50 Spachman admits that Triple-I did not provide knowledge management training but hired IKMI to provide knowledge management training and certification.

In paragraph 51 Mr. Spachman makes a claim about Dr. Morris making a statement with respect to Triple-I. He does not provided the evidentiary foundation as to where it was said, when it was said, what the context of it was, or if he was present. He has no factual basis for the statement.

In paragraph 52 Mr. Spachman offers his personal definition that a proposal does not require the Proposer be capable of providing the services that the Proposer is agreeing to provide when the offer is made. This is a personal opinion and is not based upon marketing degrees or experience in any entity other than Triple-I, which apparently believes that it does not have to be capable of performing services it offers until after it gets the contract to provide them.

In paragraph 53 Mr. Spachman purports to refute the observation by Dr. Morris that Dan Meyer was orchestrating certification in knowledge management. Mr. Spachman does not claim

to have been present or to have been personally aware of Mr. Myer's work and is therefore incapable of refuting that observation by Dr. Morris.

In paragraph 55 Mr. Spachman makes the unsupported claim that because an employee of Cubic observed that Triple-I's employee did not appear to be certified in knowledge management, it was an interference by the KMPro Parties. This is not a fact. It is only his opinion and is not admissible evidence on this motion.

In paragraph 56 Mr. Spachman offers his opinion again that Dr. Morris is a seriously disaffected former employee of Triple-I and that he somehow worked closely with Kirsch to prevent Triple-I from using IKMI and this caused damage to Triple-I's relationship with Cubic and the Army. This is an opinion. It is not a fact and is not admissible evidence.

In paragraph 57 Mr. Spachman makes the incredible claim that the KMPro Parties withheld information from Triple-I to sandbag Triple-I into making false representations that Dan Meyer was indeed certified by KMPro. This is somewhat paranoiac, and in any event, it is without foundation in fact and is an inadmissible conclusion and speculation of this purported witness.

In paragraph 58 Mr. Spachman makes the equally incredible claim that Dr. Kirsch was fully aware of when Sherry Happell attended a class and that Dr. Kirsch knew, even before seeing the fraudulent certificate presented by Mr. Meyer that Mr. Meyer was supposedly claiming to have attended the same class as Ms. Happell did. Once again this is simply not admissible evidence.

Mr. Spachman continues this allegation in paragraph 59 without any evidence whatsoever.

In paragraph 60 Mr. Spachman makes the statement that if Triple-I had known that Mr. Meyer was claiming to have attended the same class Sherry Happell attended, "it would have been able to quickly reach a correct conclusion regarding whether Meyer's representations to it were truthful." Spachman already testified directly to the contrary in his deposition where he said that even to this day, with that knowledge in hand, he could not say whether Mr. Meyer was qualified or not or if his training was administered by KMPro. This is pure speculation.

In paragraph 61 Mr. Spachman admits that he is speculating because he claims that Dr. Morris learned something "apparently" from Sherry Happell and then he claims without any factual basis that Dr. Morris was conspiring with Dr. Kirsch at the time. Mr. Spachman has no personal knowledge of what Dr. Morris learned, no basis for having personal knowledge of what Sherry Happell knew, and no personal knowledge or basis for any claim that Dr. Morris was conspiring with Dr. Kirsch. And again he claims that Dr. Morris and Dr. Kirsch were setting Triple-I up by failing to reveal that Ms. Happell was in the same class that Mr. Meyer claimed to be in, even before Meyer's claim had been revealed. Mr. Spachman has absolutely no evidence to support the allegation that Dr. Morris and Dr. Kirsch were working together on this with Dr. Kirsch advising Dr. Morris.

In Paragraph 63 Mr. Spachman attempts to rebut Dr. Morris' opinion that, based upon Mr. Morris' observations firsthand, hardly any of the BCKS was certified in knowledge management. Mr. Spachman does this by showing what other Triple-I employees were doing and were planning to do. He also claims there was no deadline. None of those things rebut Dr. Morris' conclusion based upon his firsthand knowledge and his opinion that very few were certified.

In paragraph 64 Mr. Spachman claims that he can avoid any liability for submitting false declarations in 2004 regarding Dr. Morris' experience by simply claiming those statements argue relevant facts and the Army has not asserted any claim against Triple-I or anyone else for those false claims of his experience.  A rebuttal fact would be to say what was actually made as a statement of Morris' experience.  A rebuttal fact would be to state that it was true.  A rebuttal fact would be to state that no such statement about Morris' experience was made to the Army.  None of those statements are made because Morris' statement is true.  There was a false representation of Morris' experience in the documents submitted to the Army.  It was drafted by Triple-I.

In paragraph 65 Mr. Spachman claims that a Triple-I/Cubic subcontract was dated a year before the BCKS task order was awarded.  The problem is he has not provided in discovery the Triple-I subcontract about which he is talking.  It simply has not been produced and this gentleman's recollection is not the best evidence of when any particular document was dated.

In paragraph 66 Mr. Spachman continues the same theme, there was a 2003 subcontract and that it did not deal with BCKS or knowledge management.  Again, he never produced these documents.

In paragraph 67, Mr. Spachman makes the claim that Cubic's behavior was being instigated by the KMPro Parties.  There is no factual basis for that. There is no citation to any evidence and it is not represented in the lawsuit that Triple-I filed against Cubic.  Paragraph 67 essentially admits that whatever had taken place prior to September 2006, when Triple-I sued Cubic for Cubic's bad behavior toward Triple-I, was cured and the parties agreed to join forces for the new BCKS contract.  Thus, he has admitted away Count III.

In paragraph 68 Mr. Spachman makes the wild allegation that "the Army dramatically changed its bid parameters as a result of the misconduct by the KMPro Parties, requiring the prime contractor to be a member of the ITES2 group of Department of Defense contract vendors, which excluded Cubic as a prime contractor." This allegation is not admissible evidence. First of all, no one knows what the ITES2 group is. Second, there is no witness to state what the Army parameters were. There are no documents submitted in evidence capable of allowing the Court to conclude either that the Army changed its parameters or why it would have done so. All Mr. Spachman's allegation can do is convince the court that when Triple-I responded to this motion for partial summary judgment it knew full well that Cubic teamed with Northrop Grumman and did not have a subcontract to award Triple-I.

In paragraph 69 to Mr. Spachman admits that Triple-I could not be a subcontractor of Cubic for the BCKS under the new contract. There is no damage to Triple-I because Cubic could not have hired Triple-I as a subcontractor.

Paragraph 70 Mr. Spachman admits that Triple-I entered into teaming arrangements with other entities including Northrop Grumman to bid on the re-compete contract. Nevertheless, Triple-I did not get the contract.

In paragraph 71 Triple-I finally admits that it must prove under Count III that any conduct by the KMPro Parties caused the Army to change its contract requirements and that those changes prevented Cubic from bidding on the contract and having Triple-I as a subcontractor. There is not a single shred of evidence or a single witness to support the notion that the Army changed its contract requirements because of the KMPro Parties' conduct, which changes prevented Cubic from bidding on the contract and having Triple-I as a subcontractor.

In paragraph 72 Mr. Spachman makes a strange allegation that Triple-I never competed with the KMPro Parties even though this Court previously found that it did.  Nevertheless, Mr. Spachman must and does qualify the statement in paragraph 72 to say "never competed to any extent" with the KMPro Parties because, of course, he admits that Triple-I was hiring IKMI to provide knowledge management training and certification exactly like that provided by the KMPro Parties.  This is an untenable allegation.

Paragraphs 73 through 75 are devoted to trying to establish that prior to 2006, Triple-I and Cubic were working together on the BCKS contract.  They are vague generalizations that are conclusory and do not address the question of whether there was any interference by the KMPro Parties with any relationship or contract with Cubic.

In paragraph 76 Mr. Spachman admits that the relationship between Triple-I and Cubic began to sour in 2006 and that the Army relationship also began to sour.  He offers his conclusion that this was because of interference by the KMPro Parties without any evidence from the Army.

    Respectfully submitted,

    McDOWELL, RICE, SMITH & BUCHANAN
    *A Professional Corporation*


By:   /s/ Rhonda Smiley
      Rhonda Smiley  MO #31604 - KS Fed. #70479
      605 West 47th Street, Suite 350
      Kansas City, Missouri 64112-1905
      Telephone: (816) 753-5400
      Direct: (816) 960-7325
      Facsimile:  (816) 753-9996
      rsmiley@mcdowellrice.com
      **COUNSEL FOR HUDSON ASSOCIATES CONSULTING, INC. and KNOWLEDGE MANAGEMENT PROFESSIONAL SOCIETY, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Court this 22nd day of December, 2008, and the following recipients were sent copies of same electronically by the Court:

Mr. Mick Lerner
The Law Offices of Mick Lerner, P.A.
Suite 220
10875 Benson
Overland Park, KS  66210
(P) 913.317.8000
(F):     913.317.8001
Email: mclerner@swbell.net
COUNSEL FOR THE TRIPLE-I PARTIES

Mr. Thomas Hamill
Martin, Pringle, Oliver, Wallace & Bauer, LLP
6900 College Blvd., Suite 700
Overland Park, KS  66211
(P) 913.491.5500
(F) 913.491.3341
Email: tahamill@martinpringle-kc.com
LOCAL COUNSEL FOR THE WEIDNER PARTIES

Mr. Jonathan Frieden
Odin, Feldman & Pittleman, P.C.
9302 Lee Highway, Suite 1100
Fairfax, VA  22031
(P) 703.218.2138
(F) 703.218.2160
Email: jonathan.frieden@ofplaw.com
COUNSEL FOR THE WEIDNER PARTIES

/s/ Rhonda Smiley
Rhonda Smiley, Counsel for Hudson Associates Consulting, Inc. and Knowledge Management Professional Society, Inc.