# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE TRIPLE-I CORPORATION,

        *Plaintiff*,

    Case No. 06-2195-EFM

vs.

HUDSON ASSOCIATES CONSULTING,
INC., ET AL.,

        *Defendant*.

## MEMORANDUM AND ORDER

"Knowledge is a process of piling up facts; wisdom lies in their simplification."[1]  This case involves several parties engaged in the knowledge management field, a field that creates and uses data and information to manage knowledge. The proceedings so far have been highly contentious, and the parties have compiled numerous facts but have not simplified the process.

Before the Court in Case No. 06-2195 are four Triple-I Motions for Partial Summary Judgment (Docs. 408, 409, 410, and 411).  As described in detail below, the Court grants Triple-I's motions.

---

[1]Martin H. Fischer, *Encore: A Continuing Anthology,* "Fischerisms" p. 309 (Dent Smith ed., 1945); *also available at* http://km.nasa.gov/whatis/KM_Quotes.html.

# I. General Background and Applicable Procedural Rules

There are three cases that are related. These include *Triple-I v. Hudson Associates Consulting, Inc. et al.*, No. 06-cv-2195-EFM-KMH (the "Triple-I Case");[2] *KMMentor, LLC et al. v. Knowledge Management Professional Society, Inc. et al.*, No. 06-cv-2381-EFM-KMH (the "KM Mentor Case");[3] and *Hudson Associates Consulting, Inc. et al. v. Eric Weidner, et al.*, No. 06-cv-2461-EFM-KMH (the "Hudson Case").[4] With respect to the parties, the Court will generally refer

---

[2] In Case No. 06-2195, the plaintiff is Triple-I. The defendants and counter-plaintiffs are Hudson Associates Consulting, Inc. and Knowledge Management Professional Society. The remaining Triple-I claims are: (1) cancellation of trademark under K.S.A. § 81-210; (2) tortious interference with business advantage; (3) cancellation of the mark "Certified Knowledge Leader (CKL)" under the Lanham Act; and (4) cancellation of the mark "CKM Instructor (CKMI)" under the Lanham Act. Two claims, fraudulent representation under K.S.A. § 81-212 and cancellation of the Kansas and Virginia marks under the Lanham Act, were previously dismissed.

The KMPro parties' counterclaims are: (1) trademark infringement under 15 U.S.C. § 1114; (2) unfair competition under 15 U.S.C. § 1125; (3) state trademark acts; (4) common law unfair competition; (5) tortious interference with business expectancies; (6) contributory trademark infringement; and (7) civil conspiracy to tortiously interfere, infringe marks, and unfairly compete.

[3] In Case No. 06-2381, the plaintiffs are KM Mentor and Douglas Weidner ("KM Mentor"). The defendants and counter-plaintiffs are Hudson Associates Consulting, Inc., Knowledge Management Professional Society, Dan Kirsch, John Leitch, and Wayne Hulehan ("the KMPro parties"). None of the parties in Case No. 06-2381 reside in Kansas.

KM Mentor's remaining claims are: (1) copyright infringement; (2) contributory copyright infringement; (3) infringement of trademark acts; (4) cybersquatting; (5) fraud; (6) conversion; (7) unfair competition; (8) false advertising under Virginia law; (9) breach of contract; (10) unjust enrichment; (11) misappropriation of trade secrets; and (12) conspiracy to injure trade or business. KM Mentor's defamation claim was previously dismissed.

The KMPro parties' counterclaims are: (1) trademark infringement under 15 U.S.C. § 1114; (2) unfair competition under 15 U.S.C. § 1125; (3) revised Kansas Trademark Act; (4) common law unfair competition; (5) tortious interference with business expectancies; (6) contributory trademark infringement; (7) cybersquatting; (8) breach of contract; (9) Virginia Computer Crimes Act violations; (10) civil conspiracy to tortiously interfered, infringe marks, and unfairly compete; (11) declaration of copyright and common law trademark unenforceability; (12) conversion; and (13) fraud.

[4] In Case No. 06-2461, the plaintiffs are Hudson Associates Consulting, Inc., Knowledge Management Professional Society, and Dan Kirsch ("the KMPro parties"). The defendants are Eric Weidner, Wendy Weidner, Brandon Weidner, International Knowledge Management Institute (IKMI), Ronald Dysvick, Robert Spachman, and Knowledge Central Corporation. None of the parties in Case No. 06-2461 reside in Kansas.

The KMPro parties' claims are: (1) trademark infringement under 15 U.S.C. § 1114 (against all named defendants); (2) unfair competition under 15 U.S.C. § 1125 (against all named defendants); (3) revised Kansas Trademark Act (against all named defendants); (4) common law unfair competition (against all named defendants); (5) tortious interference with business expectancies (against all named defendants); (6) contributory trademark infringement (against all named defendants); (7) cybersquatting (against IKMI and Weidners); (8) Virginia Computer Crimes Act violations (against IKMI and Weidners); (9) defamation (against Knowledge Central and Dysvick); (10) civil conspiracy to tortiously interfere, infringe marks, and unfairly compete (against all named defendants); and (11) declaration of copyright and common law trademark unenforceability (against IKMI and

to Knowledge Management Professional Society ("KMPro"), Hudson Associates Consulting, Inc. ("Hudson"), Dan Kirsch, John Leitch and Wayne Hulehan as the KMPro parties. KMMentor, LLC and Douglas Weidner will be collectively referred to as KMMentor. International Knowledge Management Institute, LLC ("IKMI"), Eric Weidner, Brandon Weidner, and Wendy Johnson Weidner will be collectively referred to as the Weidner parties. Generally, KM Mentor and the Weidner parties are aligned.

The first case, Case No. 06-2195, was filed in the District of Kansas. The second case was filed in the Eastern District of Virginia but was later transferred to the District of Kansas on September 12, 2006. The third case was filed in the District of Kansas on October 24, 2006. These three cases are consolidated for purposes of discovery because they all involve similar claims and counterclaims regarding certain service marks. The order consolidating the three cases states that pleadings related to dispositive motions should be filed in the specific case.

The Court is now considering numerous dispositive motions. In Case No. 06-2195, there are four pending motions for partial summary judgment. In Case No. 06-2381, there is one pending motion for judgment on the pleadings, three pending motions for partial summary judgment, and a motion to strike an affidavit attached to a summary judgment motion. In all, there are five motions pending in Case No. 06-2381. In Case No. 06-2461, there are seven pending motions for partial summary judgment or motion for judgment on pleadings. In total, the Court is considering sixteen motions related to these three cases.

Weidners).

-3-

The required rules for summary judgment motions in the District of Kansas are set forth in D. Kan. Rule 56.1. D. Kan. Rule 56.1(a) addresses supporting memorandums for summary judgment.

> The memorandum or brief in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies. All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party.

D. Kan. Rule 56.1(b) addresses opposing motions for summary judgment. It states:

> (1) A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed.
>
> (2) If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above. All material facts set forth in this statement of the non-moving party shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the reply of the moving party.

"[I]t is the duty of the parties contesting a motion for summary judgment to direct the court to those places in the record where evidence exists to support their positions."[5] The Court will not sift through the record in an attempt to find a genuine issue of material fact or locate arguments for

---

[5]*Boldridge v. Tyson Foods, Inc.,* 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) (citing *Caffree v. Lundahl*, 143 Fed. Appx. 102, 106 (10th Cir. 2005) and *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1513-14 (10th Cir. 1990) (stating that not only will the court not sift through the record to find support for an argument, the court will not manufacture arguments for the party)).

the parties.[6]  It is the party's responsibility to tie the facts to its legal contention.[7]  "Without a specific reference, 'we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.'"[8]

There are several issues with Triple-I's assertions of fact and the KMPro parties' response to Triple-I's facts. Occasionally, the Triple-I parties fail to include the appropriate record citations and to provide the cited evidence. Frequently, the KMPro parties fail to properly cite and provide record evidence.

The parties' attempt to incorporate by reference numerous documents filed in separate cases and dealing with separate parties is improper. While the Court is aware that the claims in these three cases are all very similar, the responsibility is on the parties to demonstrate how they overlap or differ. It also is the parties' responsibility to present their facts, arguments, and authorities in an understandable fashion. If the parties are seeking a ruling on a discreet issue, they cannot incorporate by reference their arguments with regard to other issues and expect the Court to know which facts or arguments apply to their specific issue.  In particular, they cannot incorporate by reference their arguments and expect the Court to know that they meant to incorporate their facts and not provide any discussion as to how those facts relate to the parties and claims at issue.  To the extent that the record does not support Triple-I's factual contentions, the Court will disregard those facts.  If the Court could easily ascertain to which document the KMPro parties directed the Court and it supports

---

[6]*Boldridge*, 2007 WL 1299197, at *2; *see also Cross v. The Home Depot*, 390 F.3d 1283, 1291 (10th Cir. 2004).

[7]*Boldridge*, 2007 WL 1299197, at *2 (citation omitted).

[8]*Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (citations omitted).  *See also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

their contention, the Court will consider that document.

## II. Triple-I's Motions for Summary Judgment in Case No. 06-2195 (Docs. 408, 409, 410, and 411)

### A. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[9] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[10] A fact is "material" when "it is essential to the proper disposition of the claim."[11] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[12]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[13] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[14]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[15] The opposing party must "set forth specific facts that would be admissible in evidence in the event of

---

[9]Fed. R. Civ. P. 56©).

[10]*Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[11]*Id.*

[12]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[13]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[14]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[15]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

trial from which a rational trier of fact could find for the nonmovant."[16]  Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[17]  The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[18]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[19]

## B. Uncontroverted Facts

Preliminarily, the Court will address the trademarks at issue in this case. On September 18, 2008, in a Status Conference Order, Magistrate Judge O'Hara required the KMPro parties, as well as KM Mentor, to file a detailed statement about the marks at issue with respect to each count.[20]  KM Mentor and the KMPro parties filed their statements on September 26, 2008.[21]  The KMPro parties' statement of infringements include approximately six registered federal marks, thirty-five registered state marks, and thirteen unregistered, common law marks.

---

[16]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000)(citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[17]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[18]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[19]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[20]Doc. 301 in Case No. 06-2195.  At that time, Judge O'Hara was the magistrate judge assigned, but the case was subsequently transferred to Magistrate Judge Humphreys. Doc. 348. Specifically, Judge O'Hara required the parties to "file a detailed statement with the following information with respect to each count: a. A complete and precise description of the marks at issue. b. Which adverse party (or parties) allegedly used each mark, and exactly how and on what dates(s) that occurred. c. If a word or phrase contained within the mark, or an abbreviation or acronym is associated with the mark, and allegedly was used in a manner likely to cause confusion, how and on what date(s) that occurred." Doc. 301, p. 4. Judge O'Hara required this "[i]n order to facilitate evaluation of the trademark and copyright infringement claims which the court believes will drive the ultimate settlement or adjudication of these cases." *Id.*

[21]Docs. 305, 307 in Case No. 06-2195.

Approximately nine months later, on June 15, 2009, the KMPro parties filed a motion to amend their complaint and counterclaims in each of the three consolidated cases.[22] They sought to add approximately forty-five additional marks. Although the KMPro parties only specifically referenced five marks in their motion, they also stated that they wanted to add all the marks stated in their Statement of Infringements filed on September 26, 2008.

The consolidated cases were all filed in 2006, discovery deadlines had passed, and the dispositive motion deadline for all three cases was set for June 19, 2009. On August 14, 2009, the Court denied their motion for leave to amend the complaint noting that the KMPro parties' motion to amend was untimely.[23] The Court found that "the respective positions and strategies in the consolidated cases have been highly contentious, requiring numerous conferences, hearings, and rulings," and allowing the amendments "would require a new round of discovery and the refiling of numerous dispositive motions." The Court noted that discovery was closed and the dispositive motion deadline had passed. Accordingly, it did not allow the KMPro parties to amend their complaint to add additional marks.

Generally, if a pretrial order has been entered, it governs the parties' claims.[24] Here, there is no pretrial order. Because there is no pretrial order and because the KMPro parties' motion to amend to add additional trademarks was denied, the Court will only address the trademarks included in the current complaints and counterclaims.

---

[22]Doc. 407 in Case No. 06-2195. This was four days before the dispositive motion deadline of June 19, 2009.

[23]Doc. 445 in Case No. 06-2195.

[24]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th. Cir. 2002).

The KMPro parties' current counterclaim in Case No. 06-2195 is Doc. 68, and their current complaint, the Second Amended Complaint, in Case No. 06-2461 is Doc. 49.[25] The trademarks included in this counterclaim and complaint are: (1) "CKM Instructor (CKMI)" - a federally registered mark and registered in Virginia; (2) "Certified Knowledge Leader (CKL)" - a federally registered mark; (3) "Certified Knowledge Manager (CKM)" - a mark registered in Kansas and Virginia; and (4) "Knowledge Management Certification Board (KMCB)" - a federally registered mark and a mark registered in Maryland and Virginia.[26] The marks are used in conjunction with providing knowledge management certification and training.

Triple-I is a Missouri corporation, having its principal place of business in Overland Park, Kansas. It is engaged in the business of professional management consulting, knowledge management, project management and computer application development, integration and implementation. Robert Spachman was chairman of Triple-I. Ron Dysvick was President of Triple-I until at least January 2007 and employed by Triple-I until June 1, 2007. Douglas Weidner ("Weidner") operates both KM Mentor, LLC ("KM Mentor") and International Knowledge Management Institute ("IKMI"). The Weidner parties are engaged in the business of providing knowledge management training and certification through KM Mentor and IKMI

Hudson is a Virginia corporation, having its principal place of business in Virginia Beach, Virginia. Knowledge Management Professional Society, Inc. (KMPro) is a Maryland corporation

---

[25]The KMPro parties' current counterclaim in Case No. 06-2381 is Doc. 14.

[26]Two of the federally registered marks are registered to Hudson, while the third one is registered to KMPro.
        All four of these marks are included in each complaint in the three cases but there are slight differences with respect to registrations in Virginia and Maryland. The KMPro parties sometimes include the fact that a mark is registered in Virginia and Maryland and sometimes do not include this fact. This does not appear to make a difference as there appears to only be a state law trademark infringement claim with respect to Kansas.

with its principal place of business in Severn, Maryland. Dan Kirsch is President and sole employee of Hudson. Kirsch is also KMPro's Chief Marketing Officer and its Chief Operating Officer.

The term "knowledge management" describes the technologies involved in creating, disseminating, and utilizing knowledge data and any enterprise involved in this process. Knowledge management is often abbreviated "KM." The abbreviation "KM" is commonly used and understood in the knowledge management field. Business implementation of knowledge management solutions first became widespread in the 1990's.

Weidner has been a participant in the development of the knowledge management field and has worked in the industry since its beginning in the 1990's. Throughout that time, he has assisted organizations in implementing knowledge management solutions and has trained others to do the same. From May 1995 through January 2002, he performed KM consulting and especially focused on KM training and marketing and promotion for his employer, PRC.

Weidner was involved in Knowledge Management Consortium Inc. (KMCI), the first KM professional society. In 1998, Weidner discussed with others the need for a KMCI KM Certification program, which was officially launched by KMCI as the Certified Knowledge Manager (CKM) Program in early 1999. Weidner was one of the two original CKM instructors and became Director of the KMCI CKM Program in late 2000.

In early 2000, Weidner co-founded the Knowledge Management Certification Committee, which held initial board meetings in February. Subsequently, in 2001, the other founder, Edward Swanstrom, moved to Tucson and incorporated it as Knowledge Management Certification Board, Inc. (KMCB), affiliated with an entity named "eKnowledge (eKC), Inc." Weidner left KMCB because of his decision to remain with the KMCI which had become a KMCB competitor. On

January 14, 2003, KMCB was administratively dissolved.

John Leitch was a student in a five-day KMCI "Certified Knowledge Manager (CKM)" training class taught by Weidner. Leitch received a certificate on June 8, 2001 reflecting successful completion of "the Certified Knowledge Manger workshop" that was signed by Weidner, Director, CKM Program. During this course, Leitch heard the initials "CKM" used frequently by Weidner, and those initials referred to "Certified Knowledge Manager."

Leitch co-authored an article in the Manchester Review in 2001. In that article, he referred to a Certified Knowledge Manager (CKM) Program. It stated that the CKM program was developed over a period of several years by Weidner. Leitch believes that there are thousands, if not tens of thousands, who would call themselves knowledge management practitioners worldwide. Leitch defines a "knowledge manager" as "somebody who applies knowledge management practices and techniques in their career or profession."

In mid-2001, Knowledge Management Professional Society, Inc. (KMPro) was founded. KMPro was a professional society in the knowledge management field. Weidner was involved with KMPro in the beginning. KMPro and KM Mentor entered into a Service Agreement dated May 1, 2002. This agreement was signed by Leitch as President of KMPro and Weidner as President of KM Mentor.

By 2003, Weidner began to recruit others who could be mentored to be domestic CKM Instructors so he could dedicate more time to international expansion of the CKM and eCKM training programs. Kirsch was one of the first recruits. Kirsch attended a portion of the certified knowledge manager training course that Weidner was conducting in May of 2003. Kirsch knew that certificates were being given out at the conclusion of the certified knowledge manager certification

workshops.

Kirsch defines "knowledge manager" as one of the titles of a person working within the class of knowledge management practitioners. Kirsch uses the word "certified" in connection with marks to suggest that a person has achieved certification, i.e., has fulfilled the obligations.

Kirsch uses CKM behind his name as a designator that he is a certified knowledge manager. Kirsch also uses "CKL" as a designation after his name. Sometime in 2001 or 2002, Kirsch, as President of Hudson and through his company Hudson, certified himself as a "certified knowledge leader." Kirsch is the only person who has ever been certified as a "Certified Knowledge Leader (CKL)" by Hudson.

Kirsch also uses "CKMI" to designate his personal qualifications. That mark stands for "CKM Instructor." Kirsch awarded that designation, through his company, to himself. Nobody has ever obtained the certification to use the mark "CKM Instructor (CKMI)."

The KMPRo parties are the registrants of three federally-registered trademarks including Certified Knowledge Leader (CKL), CKM Instructor (CKMI), and Knowledge Management Certification Board (KMCB). With respect to "Certified Knowledge Leader (CKL)," the USPTO required Hudson to disclaim exclusive rights to Certified Knowledge Leader apart from the mark as shown. With respect to "CKM Instructor (CKMI)," the USPTO required Hudson to disclaim exclusive rights to CKM Instructor apart from the mark as shown.

The KMPro parties are also the registrant of the Kansas trademark, Certified Knowledge Manager (CKM). On February 1, 2006, Hudson filed an application with the Secretary of State of Kansas to register this servicemark. On February 9, 2006, the Secretary of State of Kansas certified the registration of the mark "Certified Knowledge Manager (CKM)" in Kansas to be used to identify

educational, training and certification in the field of knowledge management. In the KMPro parties' trademark application with the State of Kansas, they give this description: "'Certified Knowledge Manager (CKM)' as a standard character mark, with no distinguishing characteristics or typestyles, colors or objects. No claim is made to the exclusive right to use 'certified' or 'knowledge' or 'manager' apart from the mark as shown."

Previously, on June 3, 2004, Weidner attempted to register with the USPTO the mark "Certified Knowledge Manager (CKM)." In response to the application, the examining attorney of the USPTO refused registration on the Principal Register and made the following statements:

> a. that the mark was "merely descriptive of the subject matter of the applicant's services"
> b. that from the Acronym finder website, the acronym "CKM" "was a commonly recognized acronym for certified knowledge manager"
> c. that the term "Certified Knowledge Manager" and the acronym "CKM" are common industry terms
> d. that there was "widespread descriptive usage" of the term "certified knowledge manager" and the acronym "CKM."

Triple-I never used the mark "Certified Knowledge Manager (CKM)" in its entirety. Triple-I requested documents from the KMPro parties reflecting any alleged use of the complete mark "Certified Knowledge Manager (CKM)," and the KMPro parties have produced no documents reflecting the use by Triple-I. No documents have been produced in discovery by any party, authored by, or created by Triple-I containing the mark "Certified Knowledge Manager (CKM)" in its entirety.

Triple-I also requested documents from the KMPro parties reflecting any alleged use of the three federally registered marks, "Certified Knowledge Leader (CKL)," "CKM Instructor (CKMI)," or "Knowledge Management Certification Board (KMCB)," in their entirety, and the KMPRo parties have produced no documents reflecting the use by Triple-I. Neither Triple-I nor any of its

officers and employees, ever used any of the other marks in issue, "Certified Knowledge Leader (CKL)," "CKM Instructor (CKMI)," or "Knowledge Management Certification Board (KMCB)" in their entirety.

On September 30, 2003, Cubic Applications, Inc. ("Cubic") and Triple-I entered into a subcontract in which Triple-I agreed to furnish to Cubic certain services in support of an omnibus contract between the Army and Cubic. Cubic was a contractor with the U.S. Army. On August 31, 2004, Cubic issued a task order to Triple-I under the subcontract for services to Cubic in connection with Cubic's support of the Army's Battle Command Knowledge System ("BCKS"). Triple-I had no obligation to provide knowledge management training and certification services to Cubic or the Army.

In March of 2006, Triple-I asked KM Mentor to provide a five-day training session to some Triple-I employees working on the task order. At the time, the KMPro parties did not have a contract with the Army nor with Cubic.

The KMPro parties, however, did provide training and certification services to Cubic on one occasion, during the week of March 14, 2006. At the time, the KMPro parties had no agreement or understanding with Cubic for future business at Ft. Leavenworth.

General John Schmader (Ret.), Vice-President and general manager for the education division of Cubic, informed the KMPro parties in early 2006 that he had suspended all contact between KMPro and the government and notified KMPro that it was not to do any training, at least through Cubic, to the government. On March 27, 2006, Kirsch sent an email to Dysvick, then President of Triple-I, and sent a copy of it to Colonel James Galvin, the Army's senior officer in charge of BCKS. In the email, Kirsch accused the Weidner parties of operating unlawfully and

failing to pay taxes, and accused Douglas Weidner of having been terminated from KMPro for unlawful and unethical behavior.

In an email dated April 2, 2006, addressed to General Schmader of Cubic, Kirsch accused IKMI of being "founded and operated by a man who lacks ethics and who as a matter of convenience willfully chooses to ignore the law." In that email, Kirsch stated that he was watching Triple-I show that it was willing to operate outside the law and boundaries of ethical behavior. He also stated that an unnamed third person had told him that he "would make sure that the KM community knew now that Triple-I was dirty because it was partnered with IKMI." General Schmader's responsive April 3, 2006 email indicated that until things were legally resolved between KMPro and IKMI, "there will be no solution."

General Schmader defines "knowledge management" as "the arrangement of information for its application and use." Schmader first heard the word "certified" used in connection with the phrase "knowledge management" in conjunction with the Battle Command Knowledge System ("BCKS"). Schmader heard it in the context of a group of people who had the expertise and understanding of what knowledge management was about. He explained that knowledge management was a new field and "it was thought that through some sort of certification program you would establish your credentials and understanding that were in line with a common view of what knowledge management was." Schmader did not understand that it would be only one company but that "certification would be certification." The certification had to be acceptable to the government.

Dr. Rodler Morris has a background in the KM industry and is sometimes referred to as "the father of knowledge management in the US military." Dr. Morris defines a knowledge manager as "someone who has a professional involvement in and high level of expertise in bringing that art to

bear in terms of enabling what an organization does."

Triple-I provides neither training nor certification in the field of knowledge management. Spachman, Triple-I's Chairman, stated that Triple-I had no knowledge of a relationship between the KMPro parties and either the Army or Cubic for training or certification services at Ft. Leavenworth, but it was generally aware that the KMPro parties had, on occasion, certain relationships with the Army and Cubic. Triple-I had no knowledge of any expectancy of future economic benefit from KMPro providing future training and certification services to the Army or Cubic at Ft. Leavenworth. The Weidner parties did not provide training and certification services to Cubic or the Army at Ft. Leavenworth during the relevant time period.

Triple-I had no involvement with either the KMPro parties or the Weidner parties prior to 2006 and played no role in the disputes that arose in 2004 between the KMPro parties and the Weidner parties. Triple-I engaged the Weidner parties to provide their standard five-day course for knowledge management training and certification to Triple-I's own employees only, but it never supplied any materials to the Weidner parties in connection with their training and certification of Triple-I's employees. In addition, Triple-I never had or exercised control over any of the Weidner parties or their training products, the content of their training courses, the conduct of training programs their instructor, or the issuance and content of any certificates issued by the Weidner parties. Triple-I also did not participate in the development of the Weidner parties' training materials. The Weidner parties furnished all of the training and certification materials used to provide the training and certification.

Triple-I never provided any knowledge management training and certification services to Cubic or the Army and did not provide training and certification services to either Cubic or the

Army through the Weidner parties. Because Triple-I provided no training or certification through the Weidner parties to Cubic and the Army, it could receive no profit for such services. In addition, Triple-I has never provided any knowledge management training to anyone or issued any certificates for such training to anyone. Triple-I had no agreement with or commitment to the KMPro parties to provide any of the training of its employees that was provided by the Weidner parties.

## C. Analysis

Triple-I seeks summary judgment as to each of the KMPro parties' counterclaims and summary judgment with respect to one count of its Amended Complaint against the KMPro parties. Triple-I has filed four separate motions.[27]

### *1. Motion for Summary Judgment as to Counts I and III (Doc. 408)*

### *a. Count I (Trademark Infringement under 15 U.S.C. § 1114) - Federally Registered Marks of CKM Instructor (CKMI), Certified Knowledge Leader (CKL), and Knowledge Management Certification Board (KMCB)*

Triple-I argues that (1) none of the marks at issue are protectable; (2) even if they are protectable, Triple-I never used them; (3) to the extent Triple-I used a component phrase of the marks, it did not constitute use of the marks; (4) any such use constitutes "fair use;" and (5) to the extent Triple-I may have used a component of the marks, no confusion occurred or was likely to occur.

To establish a trademark infringement claim, a plaintiff must prove that: (1) the mark is valid and protectable; (2) defendant used the mark in commerce without consent; and (3) defendant's use

---

[27]The Court notes that the filing of separate motions with respect to one case, but with respect to discrete issues, appears to circumvent D. Kan. Rule 7.1(e) limiting the argument and authorities section to 30 pages. Counsel is cautioned to not engage in this practice.

of the mark is likely to cause confusion.[28] Although Triple-I first argues that these three federally-registered marks are not protectable because they are generic or merely descriptive, the Court will not address this issue with respect to Triple-I.[29]

Here, even if there is an issue of fact with regard to whether the marks are protectable, a plaintiff "must demonstrate that Defendants used the trademark 'in connection with any goods or services'" to establish trademark infringement.[30] Triple-I states that there is no evidence that it used these marks. The KMPro parties have not directed the Court to any evidence of Triple-I's use, or any of its officers and employees' use, of these marks, either in their entirety or the use of components.[31]  As such, the KMPro parties fail to demonstrate that there is a genuine issue of fact as to an essential element of their claim.  Accordingly, Triple-I is granted summary judgment on Count I.

### b. Count III - Certified Knowledge Manager (CKM)

Certified Knowledge Manager (CKM) is not federally registered, but it is registered in Kansas.  "The Kansas Trademark Act is the state counterpart of the Lanham Act."[32]  K.S.A. § 81-

---

[28]*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008); *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994).

[29]In Case No. 06-2381, the Court concluded that KM Mentor had not produced sufficient evidence to overcome the presumption of validity and demonstrate that these three federally registered marks were generic.

[30]*Utah Lighthouse*, 527 F.3d at 1050 (citing 15 U.S.C. § 1125(a)(1)).

[31]With respect to the three federally registered marks, the KMPro parties offer no argument but instead assert that they incorporate by reference their response to Triple-I's previous motion for judgment on the pleadings and the Court's order denying that motion.  Although Triple-I stated that it incorporated by reference its previous motion for judgment on the pleadings, it also provided eighteen pages of argument with supporting facts in its motion for summary judgment as to why the KMPro parties' marks were not protectable and that Triple-I did not use the marks. The KMPro parties' briefing with respect to Triple-I's motion for judgment on the pleadings does not adequately address these issues.

[32]*Am. Plastic Equip., Inc. v. Toytrackerz, LLC*, 2008 WL 917635, at *8 (D. Kan. Mar. 31, 2008).

220(b) states:

> The intent of this act is to provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the trademark act of 1946, as amended. To that end, the construction given the federal act should be examined as persuasive authority for interpreting and construing this act.

The elements of proof under both the Kansas Trademark Act and the federal Lanham Act "are identical - in order to claim a protected interest, the party must establish ownership of, or a protectable interest in, the trademark."[33]

Although the Kansas Trademark Act is a counterpart to the Lanham Act and construction of the federal act should be examined as persuasive authority, the mark registered in Kansas is not entitled to a presumption of validity. Under the Lanham Act, there is a statutory presumption of validity with respect to registered marks. 15 U.S.C. § 1115(a) provides that "a mark registered on the principal register . . . shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark . . . ." This presumption is not provided by the Kansas Trademark Act.[34]

In addition, it appears that the requirements for registering a mark in Kansas do not involve the same requirements as registering a mark with the USPTO. There are no provisions in the Kansas Trademark Act similar to the Lanham Act which provide for a detailed application process, publication of the application, and an examination by an examiner.[35] Indeed, it appears that the

---

[33]*Id.* at *12.

[34]The Kansas Court of Appeals recognizes that there may be provisions in the Kansas Trademark Act that differ from the federal Lanham Act. *See, e.g, Harp v. Appliance Mart, Inc*., 16 Kan. App. 2d 696, 699, 827 P.2d 1209, 1212 (1992) (interpreting Kansas' previous Trademark Act and stating that "[w]hen Kansas enacted its law, it chose not to include that portion of the federal law granting protection to a mark that has become distinctive based on continuous use for five years.").

[35]*See, e.g.*, 15 U.S.C. § 1051 (application for registration; verification).

KMPro parties filed their application for registration of this mark in early February 2006, and the registration was granted within days.  At the most, a time period of eight days had elapsed between application and registration of this mark.

Although the KMPro parties contend that eight days is more than sufficient for a state employee to conclude that a mark is not generic, they do not direct the Court to any evidence or case law regarding the presumption of validity with respect to a mark registered in Kansas.  Because Kansas does not have the detailed and structured requirements for registering marks as the Lanham Act and does not specifically provide for a statutory presumption of validity upon registration, there is no presumption of validity with respect to the mark registered in Kansas.  Accordingly, the KMPro parties have the burden in demonstrating that they have a valid and protectable mark.

Triple-I argues that (1) the Kansas mark is not protectable because it is generic; (2) if the mark is not generic, it is merely descriptive; (3) even if the mark is protectable, Triple-I never used the mark; (4) even if the marks are protectable and were used by Triple-I, there was no likelihood of confusion; and (5) any such use constitutes "fair use."

A term is generic if it is used to describe the relevant product or service. A term is generic if it is used to describe the relevant product or service.  If a term is generic because it refers to a general class of goods and does not indicate the particular source of an item, it does not receive trademark protection.[36]  To determine whether a term is generic, some courts have relied upon the "Who are you? - What are you? test.[37]  "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the name of a product answers the

---

[36]*The Golf Warehouse, L.L.C. v. Golfers' Warehouse, Inc.*, 142 F. Supp. 2d 1307, 1309 (D. Kan. 2001).

[37]*Id.* at 1310.

question 'What are you?'"[38]  Because a term may answer both questions simultaneously, "[t]he

primary significance of the registered mark to the relevant public rather than purchaser motivation

shall be the test for determining whether the registered mark has become the generic name of goods

or services on or in connection with which it has been used."[39]  "The generic name of a product –

what it is – can never serve as a trademark."[40]

"When the relevant public ceases to identify a trademark with a particular source of a product

or service but instead identifies the mark with a class of products or services regardless of source,

that mark has become generic and is lost as an enforceable trademark."[41] To rebut the presumption

that a mark is not generic, the alleged infringer "must offer sufficient proof that 'the primary

significance of the mark [is] its indication of the nature or class of the product or service, rather than

an indication of source."[42] In addition, "the evidence must demonstrate the generic understanding

of the mark from the viewpoint of the relevant public."[43]

"Evidence offered to rebut the presumption of validity may come from any number of

sources, including purchaser testimony, consumer surveys, listings and dictionaries, trade journals,

---

[38]*Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993) (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 12.01 (3d ed. 1992)); *see also Golf Warehouse*, 142 F. Supp. 2d at 1310.

[39]15 U.S.C. § 1064(3).

[40]*Official Airlines*, 6 F.3d at 1391.

[41]*Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544 (10th Cir. 2000) (citing *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir. 1996)).

[42]*Retail Services Inc. v. Freebies Publ'g*, 364 F.3d 535, 544 (4th Cir. 2004) (citing *Glover,* 72 F.3d at 59); *see also Creative Gifts*, 235 F.3d at 544.

[43]*Retail Services*, 364 F.3d at 544 (internal quotation and citations omitted); *see also Creative Gifts*, 235 F.3d at 544 (citation omitted) and 15 U.S.C. § 1064(3).

newspapers, and other publications."[44]   Additionally, evidence of genericness may come from "generic use by competitors, generic use of the term by the mark's owners, and use of the term by third parties in trademark registrations."[45]

In this case, the mark is compound and also involves an abbreviation or acronym. The Court must determine its validity by looking at the mark as a whole because "[c]ertain terms may connote more than the sum of their parts."[46] However, some composite terms "are nothing more than the sum of their parts."[47] "[I]f the components of a trade name are common descriptive terms, a combination of such terms retains that quality."[48] "Abbreviations for generic or common descriptive phrases must be treated similarly."[49]

The question with regard to whether this mark is generic is whether the primary significance to the relevant public is an indication of the general class of product. Triple-I designates the "relevant public" as sophisticated corporations and governmental entities which function in the field of knowledge management. The Court also concludes that it encompasses individuals interested in obtaining or purchasing knowledge management training.

---

[44]*Retail Services*, 364 F.3d at 544 (quotation and citations omitted); *see also Creative Gifts*, 235 F.3d at 545 (citation omitted).

[45]*Retail Services*, 364 F.3d at 544 (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 406 (6th Cir. 2002)).

[46]*Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir. 1986).

[47]*Id.*

[48]*Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 488 (7th Cir. 1982).

[49]*Id.* (citation omitted).  *See also Blinded Veterans Ass'n v. Blinded Am.Veterans Found.*, 872 F.2d 1035, 1041 n. 12 (D.C. Cir. 1989) ("[I]f the full name is generic, an abbreviation is treated similarly.").

Here, Triple-I offers evidence that the knowledge management field has been using this phrase since at least 1998; witnesses define the term "knowledge manager" as a class of people; a number of people who work in the field of knowledge management use the term "certified knowledge manager;" the USPTO denied Weidner's 2004 trademark application for the term "Certified Knowledge Manager (CKM)" because it was merely descriptive; the acronym CKM stands for certified knowledge manager as noted by several individuals and the USPTO's examining attorney; the KMPro parties' disclaimed the individual words "certified," "knowledge," and "manager" in their Kansas application; and Kirsch, President of Hudson and the applicant for the mark in Kansas, had knowledge that the term was being used in May of 2003 when he attended a portion of the certified knowledge manager training course that Weidner was conducting. Triple-I also points out that the KMPro parties have not undertaken any consumer survey with respect to this term.

The KMPro parties assert that the mark is not generic. It appears that the KMPro parties contend that the term is not generic because numerous people want to use the term and because Weidner attempted to register the term with the USPTO. In addition, the KMPro parties state that testimony from Robert Spachman, Chairman of Triple-I, indicates that Triple-I admits that Certified Knowledge Manager (CKM) is inherently distinctive because it requires imagination to reach a conclusion of the nature of the service. Finally, the KMPro parties assert that multiple government officials have reviewed the mark and several variations and not one has concluded it is generic.

The majority of the KMPro parties' assertions are not supported by the record. With respect to numerous individuals wanting to use the term and Weidner's application to the USPTO for registration of this mark, the USPTO refused registration because the mark was merely descriptive.

This undercuts the KMPro parties' assertion that numerous officials have reviewed the mark and not one has concluded it is generic. The USPTO refused to register the mark because it was merely descriptive. It also demonstrates that it may be the only way to describe a certified knowledge manager. Furthermore, although Kansas registered the mark, it seems doubtful that an eight-day period from application to registration is sufficient to fully examine whether or not the mark is generic.

With respect to Spachman's testimony about the mark, his testimony is as follows:

Q (Ms. Smiley). You said that the phrase Certified Knowledge Manager (CKM) is not suggestive. Do you recall that testimony?
A (Spachman). Yes.
Q. What do you mean when you use that language?
A. That language being?
Q. Suggestive.
A. That it takes imagination to decipher what the term means.

Therefore, in direct contrast to the KMPro parties' assertion that Spachman admitted that the mark was inherently descriptive, the testimony actually indicates that Spachman testified that he believed that Certified Knowledge Manager (CKM) was not suggestive because it did not require imagination to decipher what the term means.

Here, the mark Certified Knowledge Manager (CKM) is a combination of three words, all individually disclaimed, followed by an acronym that is the first letter of these three words. The combination of these three component words does not change the genericness or descriptiveness of the three component words. The words simply indicate that an individual is a certified knowledge manager. The acronym CKM, as recognized by the USPTO examining attorney and numerous individuals involved in the knowledge management field, simply stands for certified knowledge manager.

Numerous witnesses define a "knowledge manager" as a class of people. The fact that the knowledge managers are certified does not indicate who awarded the knowledge managers a certificate. It merely stands for a category of individuals who are certified knowledge managers. The Court has not been provided with any survey evidence nor any evidence that consumers or individuals associate this mark with a particular source.[50] Triple-I has demonstrated to the Court with sufficient evidence that the relevant public understands that this mark signifies a class rather than a source.

The KMPro parties simply have not directed the Court to any relevant evidence that demonstrates that there is a question of fact with respect to whether this term is not generic. Triple-I has directed the Court to evidence that demonstrates the term is generic as the phrase answers the question "What are you?" because the necessary response is certified knowledge manager. The CKM acronym does not add anything to the phrase as it is just the first letter of each component word. Accordingly, Triple-I is granted summary judgment as to Count III with respect to trademark infringement.

Triple-I's motion for summary judgment as to Counts I and III (Doc. 408) is granted in its entirety.

### 2. Motion for Summary Judgment as to Counts II, III, and IV (Doc. 409)

Triple-I seeks summary judgment with respect to unfair competition issues in Counts II, III, and IV of the KMPro parties' Amended Complaint. Count II involves a claim of unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In Count III, the KMPro parties assert a claim of unfair competition under the Revised Kansas Trademark Act. Count IV contains a claim

---

[50]Although KMPro argues that Triple-I's argument demonstrates that the mark identifies the source and quality of the KMPro parties' services, the Court cannot so find.

for unfair competition under the common law.

"To prevail in an action for unfair competition under § 43(a) [of the Lanham Act], a plaintiff must establish that (1) her mark is protectable, and (2) the defendant's use of [an identical or similar] mark is likely to cause confusion among consumers."[51]  For the reasons stated above that the KMPro parties have not established that Triple-I used the three federally-registered marks, Triple-I is granted summary judgment as to Count II. To the extent that the KMPro parties brought an unfair competition claim under the Kansas Revised Trademark Act, for the reasons stated above that the KMPro parties do not have a protectable mark because it is generic, Triple-I is granted summary judgment as to Count III.

In Kansas, unfair competition under the common law requires the same elements as under Section 43(a) of the Lanham Act.[52]  "To prevail under either theory, plaintiff must prove (1) it owns a valid, protectable servicemark and (2) defendant's service is so similar to plaintiff's it is likely to cause consumer confusion."[53]  For the reasons stated above that the KMPro parties have not established that Triple-I used the three federally-registered marks and that the KMPro parties' mark registered in Kansas is not protectable because it is generic, Triple-I is granted summary judgment as to the common law unfair competition contained in Count IV.

Accordingly, Triple-I's motion for summary judgment as to Counts II, III, and IV (Doc. 409) is granted in its entirety.

---

[51]*Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004) (internal quotations and citations omitted).

[52]*Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.*, 26 Kan. App. 2d 104, 105, 979 P.2d 144, 148 (1999).

[53]*Id.*

### 3. Motion for Summary Judgment as to Counts V, VI, and VII (Doc. 410)

### a. Count V - Tortious Interference with Business Advantage

Triple-I contends that the KMPro parties have no evidence as to any elements of their tortious interference with business expectancies claim. Under Kansas law, the required elements for tortious interference with a prospective business advantage are:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.[54]

In addition, a plaintiff must demonstrate that the defendant acted with malice.[55] Malice is defined as acting "with actual evil-mindedness or specific intent to injure."[56]

With respect to the first element, Triple-I asserts that the KMPro parties cannot prove the existence of a business relationship or expectancy with a reasonable certainty to realize a future economic benefit. An essential element of a tortious interference claim requires the plaintiff "to show it was reasonably certain it would realize a future economic benefit."[57] The facts demonstrate that the KMPro parties did not have a contract with either Cubic or the Army. Although the KMPro

---

[54]*Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106, 1115 (1986); *see also Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo., Inc.*, 431 F.3d 1241, 1262-63 (10th Cir. 2005) (citing *PulseCard, Inc. v. Discover Card Servs., Inc.*, 917 F. Supp. 1488, 1498 (D. Kan. 1996)). Although the KMPro parties entitled their claim "tortious interference with business expectancies," it is just different terminology.

[55]*Pepsi-Cola Bottling Co.*, 431 F.3d at 1263 (citing *L & M Enters., Inc., v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000)).

[56]*Turner*, 240 Kan. at 8, 722 P.2d at 1113.

[57]*Macke Laundry Serv. Ltd. v. Mission Assocs., Ltd.*, 19 Kan. App. 2d 553, 561, 873 P.2d 219, 225 (1994).

parties provided training and certification services to Cubic on one occasion, during the week of March 14, 2006, the KMPro parties had no agreement or understanding with Cubic for future business at Ft. Leavenworth.

The KMPro parties contend that they have established a thorough factual basis for their contention that they had a sufficient business expectancy. However, the KMPro parties have not directed the Court to any evidence nor have they provided the Court with any evidence demonstrating the existence of a business relationship or expectancy with a reasonable certainty to realize a future economic benefit. While the KMPro parties performed one training, they have not shown that they expected to perform another training or provide anything else to the Army or Cubic.

In viewing the evidence in the light most favorable to the KMPro parties, however, there may be an inference that the KMPro parties had an expectancy to realize a future economic benefit from the fact that Schmader informed the KMPro parties that he had suspended all contact between KMPro and the government and until things were legally resolved between IKMI and KMPro, there would be no solution. Even resolving this inference in the KMPro parties' favor, their tortious interference claim still fails because there is no evidence as to the third, fourth, and fifth elements of their claim.

If a plaintiff cannot demonstrate there is evidence giving rise to a question of material fact as to the third and fourth elements, a defendant is entitled to summary judgment.[58] The third element requires that but for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy.[59] The KMPro parties have not directed the Court to any

---

[58]*Pepsi-Cola*, 431 F.3d at 1263.

[59]*Id.*

-28-

evidence that but for Triple-I's conduct, the KMPro parties were reasonably certain to continue its relationship. General Schmader's emails indicated that he did not want to become involved in the middle of a rift between KMPro and IKMI and there would be no solution until things were resolved legally between IKMI and KMPro. Although the KMPro parties contend that Triple-I's conduct in infringing on the KMPro parties' marks damaged their relationship, as noted above, the KMPro parties failed to present evidence of infringement by Triple-I.

Furthermore, the fourth element requires intentional misconduct by the defendant.[60] The plaintiff must demonstrate that the defendant acted with malice, or actual evil-mindedness or specific intent to injure. The KMPro parties have not directed the Court to any evidence indicating intentional misconduct or malice by Triple-I. The KMPro parties state that an email from Dysvick, Triple-I's chairman, to General Schmader, indicates that Triple-I took "a very active role in trying to block KMPro from conducting future business with the Army." It is far too speculative and conclusory to infer from the language in Dysvick's email that Triple-I engaged in intentional misconduct with a specific intent to injury the KMPro parties.

Finally, the KMPro parties have not presented any evidence that they suffered any damages as a result of Triple-I's conduct. The KMPro parties have stated that their damages is the amount of training encounters and certificates issued by Triple-I. Triple-I never provided knowledge management training and certification services to Cubic or the Army nor did it provide training and certification services to either Cubic or the Army through the Weidner parties. As such, Triple-I received no profit for such services.

---

[60]*Id.*

In sum, there is no evidence indicating that there is a question of fact that but for the intentional misconduct of Triple-I, the KMPro parties were reasonably certain to continue their relationship with the Army or Cubic or that the KMPro parties suffered damages. Because there are no genuine issues of material fact with respect to elements three, four, and five of the KMPro parties' tortious interference claim, their claim fails. Accordingly, Triple-I is granted summary judgment as to this claim.

### b. Count VI - Contributory Infringement

Triple-I contends that the KMPro parties have no evidence demonstrating that it contributorily infringed on any of the KMPro parties' marks. In discussing contributory trademark infringement, the United States Supreme Court stated that "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."[61] "The elements of a contributory liability claim are thus (1) supply of a product and (2) knowledge of direct infringement."[62]

The KMPro parties contend that Triple-I has not negated any element and that the KMPro parties have demonstrated the two simple elements of a contributory trademark infringement claim. They assert that Triple-I supplied the "product," the Weidner parties' training and certification services, to the Army and Cubic, with the knowledge that the Weidner parties were infringing on

---

[61] *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982); *see also Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 983 (9th Cir. 1999) ("Contributory infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark.").

[62] *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003).

the KMPro parties' marks. However, case law discussing contributory trademark infringement requires that the party contributing to the infringement supply the product to the infringer. As noted above, if a party "continues to supply its product *to one whom it knows or has reason to know is engaging in trademark infringement*, the [party] is contributorily responsible for any harm done as a result of the deceit."[63]

Here, the KMPro parties assert that Triple-I supplied the product to a non-infringing party, Cubic or the Army. They do not contend that Triple-I supplied the product to the Weidners, the alleged infringers. In fact, the evidence demonstrates Triple-I never supplied any materials to the Weidner parties in connection with the Weidners' training and certification of Triple-I's employees. In addition, Triple-I never exercised control over any of the Weidner parties or their training products, the content of their training courses, the conduct of training programs their instructor, or the issuance and content of any certificates issued by the Weidner parties.[64] Triple-I also did not participate in the development of the Weidner parties' training materials. The Weidner parties furnished all of the training and certification materials used to provide the training and certification.

Furthermore, the evidence does not support the KMPRo parties' contention that Triple-I supplied the product to Cubic or the Army. The evidence demonstrates that Triple-I did not provide knowledge management training and certification services to Cubic or the Army and did not provide training and certification services to either Cubic or the Army through the Weidner parties. The KMPro parties have not directed this Court to any evidence that controverts these facts.

---

[63]*Inwood*, 456 U.S. at 854 (emphasis added).

[64]The KMPro parties' assertion that Triple-I controlled the means of infringement by not seeking any change in the training or certification the Weidners were providing is without merit. There are no facts nor case law supporting this contention.

Accordingly, Triple-I is granted summary judgment with respect to this claim.

### c. Count VII - Civil Conspiracy

Triple-I contends that the KMPro parties have no evidence to support their claim for civil conspiracy. To establish a civil conspiracy in Kansas, a plaintiff must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."[65] "Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy."[66]

Triple-I demonstrates that the KMPro parties do not allege more than one person or entity in their civil conspiracy claim or an unlawful objective. They also demonstrate that the Weidner parties and Triple-I did not have a meeting of the minds to obtain an unlawful objective, and the KMPro parties cannot demonstrate any damages.

The KMPro parties spend four pages discussing a civil conspiracy. Although they make numerous contentions as to the facts and evidence that support their claim, they do not specifically cite to the record or direct the Court to this evidence, and they do not include any exhibits to their response that would demonstrate that they have support.[67] Suffice to say, the KMPro parties have failed to direct the Court to any evidence supporting their claim that would indicate there is a genuine issue of material fact. As such, Triple-I is entitled to summary judgment on Doc. 410.

---

[65]*Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153, 161 (1984) (citation omitted).

[66]*Id.*

[67]It appears that the only objective the KMPro parties even allege in their response is that Triple-I's plan was to move into the training and certification field and to eliminate the KMPro parties. They do not provide any support for this proposition.

***4. Motion for Summary Judgment as to Count II of Triple-I's Amended Complaint (Doc. 411)***

Triple-I seeks summary judgment as to Count II in their Amended Complaint, cancellation of the KMPro parties' Kansas mark, Certified Knowledge Manager (CKM), on the basis that it is generic. Triple-I relies on K.S.A. § 81-210.[68]

K.S.A. § 81-210(c)(5) provides that the Kansas Secretary of State "shall cancel from the register, in whole or in part . . . any registration concerning which a court of competent jurisdiction finds that . . . the mark is or has become the generic name for the goods or services, or a portion of the goods or services, for which it has been registered."  In addition, K.S.A. § 81-210(d) provides for cancellation "when a court of competent jurisdiction orders cancellation of a registration on any ground."

For the reasons stated above that the Court finds the Kansas mark, Certified Knowledge Manager (CKM), is generic or merely descriptive, the Court grants Triple-I's motion for cancellation of the mark.  Accordingly, Triple-I's motion for summary judgment as to Count II of its Amended Complaint is granted.

**IT IS ACCORDINGLY ORDERED** this 17th day of May, 2010 that Triple-I's Motions for Summary Judgment (Docs. 408, 409, 410, and 411) in Case No. 06-2195 are hereby granted.

**IT IS SO ORDERED**.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[68]The Court previously determined that Triple-I had standing in Doc. 435 when the KMPro parties sought summary judgment as to Count II of Triple-I's complaint on the basis that Triple-I lacked standing.